### UNITED STATES BANKRUPTCY COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In re:

REGINE O. AMAN,

     Debtor.

_____/

RAY NIELSON and
PANDORA NIELSON,

     Plaintiffs,

vs.

REGINE O. AMAN,

     Defendant.

_____/

REGINE O. AMAN,

     Third-Party Plaintiff,

vs.

EQUITABLE TITLE AGENCY, INC.,

     Third-Party Defendant.

_____/

Case No. 6:08-bk-06203-ABB
Chapter 7

**FILED**

**MAR 2 6 2010**

CLERK U.S. BANKRUPTCY,
ORLANDO DIVISION

Adv. Pro. No. 6:08-ap-00216-ABB

### MEMORANDUM OPINION AND ORDER

This matter came before the Court on the: (i) Amended Complaint Seeking Exception to Discharge and Imposition of Equitable Lien (Doc. No. 3) filed by the Plaintiffs Ray Nielson and Pandora Nielson (collectively, "Plaintiffs") against the Defendant and Debtor Regine O. Aman ("Aman"); (ii) Aman's Third Party Complaint (Doc. No. 14) filed against Equitable Title Agency, Inc. ("Equitable"); and (iii) Aman's

Motion for Summary Judgment (Doc. No. 26) filed against Equitable. Plaintiffs request the mortgage lien encumbering the home they purchased from Aman be deemed nondischargeable on the basis Aman fraudulently failed to disclose the lien at closing and accepted and retained proceeds of sale of $225,127.00 knowing she was not entitled to such proceeds. Aman seeks judgment against the closing agent Equitable for negligently failing to satisfy the lien at the sale closing.

The final evidentiary hearing was held on January 19, 2010 at which Aman, Plaintiffs, and their respective counsel appeared. The parties filed closing briefs pursuant to the Court's request.[1] Equitable did not file any response or make any appearance in this proceeding.

The unsatisfied mortgage indebtedness is nondischargeable and judgment is due to be entered in favor of Plaintiffs and against Aman pursuant to 11 U.S.C. Sections 523(a)(2)(A) and 523(a)(2)(B). Aman's Third Party Complaint against Equitable is due to be dismissed because a negligence cause of action is not actionable pursuant to Florida State law. The Court makes the following Findings of Fact and Conclusions of Law after reviewing the pleadings and evidence, hearing live testimony and argument, and being otherwise fully advised in the premises.

### *Parties' Ore Tenus Motions*

#### *Plaintiffs' Motion:*

Plaintiffs' Amended Complaint consists of three counts: (i) Count I titled "Non-dischargeability of Debt – Section 523(a)(2)"; (ii) Count II titled "Establishment of Equitable Lien"; and (iii) Count III titled "Money Judgment." Plaintiffs did not plead a

---

[1] Doc. No. 46; Main Case Doc. No. 41 (Plaintiffs erroneously filed their closing brief in the Debtor's Main Case and not in the Adversary Proceeding).

specific subsection of 523(a)(2). They made an *ore tenus* motion at trial to amend the Amended Complaint to conform it to the evidence asserting this matter constitutes an 11 U.S.C. Section 523(a)(2)(A) nondischargeability cause of action. Aman agrees this matter constitutes a Section 523(a)(2)(A) cause of action and does not oppose Plaintiffs' motion.[2]

The evidence presented at trial relates both to a Section 523(a)(2)(A) cause of action and a Section 523(a)(2)(B) cause of action. Plaintiffs, however, did not plead Section 523(a)(2)(B) in their Amended Complaint or raise it in their *ore tenus* motion. They make reference to Section 523(a)(2)(B) in their closing brief, but have not expressly sought to amend their pleadings to include a Section 523(a)(2)(B) cause of action.

Federal Rule of Civil Procedure 15(b), made applicable to bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 7015, grants the Court liberal authority to amend the pleadings to conform them to the evidence where an issue is tried by the implied consent of the parties.[3] Implied consent does not exist where the defendant will be prejudiced.[4] A defendant is prejudiced when she "had no notice of the new issue, if the defendant could have offered additional evidence in defense, or if the defendant in some other way was denied a fair opportunity to defend."[5]

The parties have presented and tried Section 523(a)(2)(A) and Section 523(a)(2)(B) causes of action, even though these Bankruptcy Code provisions were not specifically pled by Plaintiffs. Aman impliedly consented to the trial of Section 523(a)(2)(A) and Section 523(a)(2)(B) causes of action. The evidence presented is

---

[2] Doc. Nos. 44, 46.
[3] Fed. R. Civ. P. 15(b)(2).
[4] Cioffe v. Morris, 676 F.2d 539, 541-42 (11th Cir. 1982)
[5] Id. at 542.

3

relevant to Section 523(a)(2)(A) and Section 523(a)(2)(B) causes of action. All pertinent evidence has been presented. Aman had a fair opportunity to defend herself.

The pleadings are hereby amended to conform to the evidence presented at trial pursuant to Federal Rule of Civil Procedure 15(b)(2) to include Section 523(a)(2)(A) and Section 523(a)(2)(B) allegations.

### *Aman's Motion:*

Aman, at the close of Plaintiffs' case, made an *ore tenus* motion to dismiss the Amended Complaint asserting Plaintiffs had failed to establish the nondischargeability elements of Section 523(a)(2)(A). The Court reserved ruling on the motion. Plaintiffs have established the elements of Sections 523(a)(2)(A) and 523(a)(2)(B). Aman's motion to dismiss is hereby denied.

## FINDINGS OF FACT

### *The Windermere Property*

Aman and her husband William H. Aman, Jr. purchased in 1993 a new single-family home located at 1723 Lake Roberts Court, Windermere, Florida 34786 with Parcel Identification Number 01-23-27-1108-01-150 (the "Windermere Property"). They extensively upgraded the property and enjoyed it for many years. Their son was born while they resided there. Aman's husband passed away after a lengthy struggle with a serious illness.

Aman began dating Milburn "Sonny" Harper ("Sonny") in 2003 and he moved into the Windermere Property with Aman. Sonny has exerted considerable influence over Aman during their relationship. He suggested she sell the Windermere Property so

they could relocate to Clermont, Florida to be closer to his children. Aman agreed and placed the Windermere Property on the market in June 2004.

Plaintiffs and Aman executed a Residential Sale and Purchase Contract on or about October 11, 2004 ("Sale Contract") pursuant to which Plaintiffs agreed to pay and Aman agreed to accept $663,900.00 for the Windermere Property.[6] The Sale Contract is the standard Florida contract created by the Florida Association of Realtors, FAR-6. The closing of the sale was set for November 29, 2004. Aman agreed to convey to Plaintiffs "marketable title to the Property by statutory warranty deed . . ." and a "title insurance commitment issued by a Florida-licensed title insurer in the amount of the purchase price and subject only to title exceptions set forth in this Contract."[7]

When the parties executed the Sale Contract the Windermere Property was encumbered by a first-priority mortgage held by BankUnited F.S.B. ("BankUnited") in the amount of approximately $332,893.00. No other mortgages encumbered the Windermere Property. There was substantial equity of approximately $331,000.00 in the Windermere Property as of October 11, 2004.

Sonny suggested Aman withdraw a portion of the Windermere Property's equity through a home equity line of credit, ostensibly to be used as a down payment for the purchase of a property in Clermont. Aman agreed and, with Sonny's involvement, pursued a home equity line of credit from First Horizon Loan Corporation ("First Horizon"). First Horizon, based upon an appraisal of the Windermere Property, approved a home equity loan with a "Maximum Principal Amount" of $225,127.00.[8]

---

[6] D's Ex. A.
[7] Id. at ¶10.
[8] D's Ex. C.

The First Horizon loan closing occurred on November 9, 2004 at which Aman executed various closing documents, including a HUD-1 Settlement Statement, and First Horizon loan documents. She executed in favor of First Horizon a Multistate Home Equity Line of Credit Agreement ("Note") in the principal amount of $225,127.00, with interest accruing at a variable rate, and a Florida Open-End Mortgage on November 9, 2004.[9] Loan proceeds of $83,362.95 were disbursed by the closing agent to MBNA and Marriott to pay off Aman's credit card and home improvement debts.[10] Aman received the cash proceeds balance of $143,915.55 at closing.[11] Aman's equity withdrawal reduced the equity in the Windermere Property by $225,127.00.

The First Horizon Florida Open-End Mortgage was recorded in the Official Record Book of Orange County, Florida on November 16, 2004 at Book 07702, Page 3135.[12] First Horizon held a properly perfected second-priority mortgage of record on the Windermere Property as of November 16, 2004. Aman understood the First Horizon loan was secured by the Florida Open-End Mortgage and was in second position to the BankUnited mortgage.

Equitable was selected as the closing agent for the sale of the Windermere Property to Plaintiffs. Aman had telephone communications with Susan J. Gordon ("Gordon"), an Equitable employee, regarding the closing scheduled for November 29, 2004 and informed her of the First Horizon mortgage. Equitable prepared and transmitted to Aman a draft HUD-1 Settlement Statement, which Aman reviewed.

---

[9] Id. The parties did not present a copy of the Multistate Home Equity Line of Credit Agreement. The Agreement is a document of record as it was filed as an attachment to Claim No. 1-1 filed by First Tennessee Bank, N.A., as the successor to First Horizon, in Aman's Main Case.
[10] D's Ex. B.
[11] Id.
[12] D's Ex. C.

Aman identified two errors in Equitable's draft HUD-1 Settlement Statement:

(i)    It included a line item for the payoff of the BankUnited mortgage, but did not include a line item for the payoff of the First Horizon mortgage; and

(ii)   It included a line item for a prepayment penalty for the BankUnited mortgage.

Aman sent a letter with attachments to Gordon via facsimile on November 27, 2004 addressing the two errors and stating, in part:

Also, I am including information that you will need for paying off the recent Heloc on my home. I did this in order to have ready cash to move on other property opportunities.[13]

Aman included with her letter correspondence from First Horizon dated November 9, 2004 regarding the loan number and contact information for the servicer of the loan.[14]

Equitable received Aman's November 27, 2004 fax as evidenced by Equitable's removal of the BankUnited prepayment penalty from the HUD-1 Settlement Statement presented to the parties at closing and the letter being part of Equitable's closing file that Equitable produced in response to Aman's subpoena duces tecum.[15]

Aman understood the BankUnited and First Horizon mortgages were encumbrances on the Windermere Property which had to be fully satisfied at closing in order for her to convey marketable title to Plaintiffs. Aman, based upon the payoff of both mortgages, was expecting to receive cash sale proceeds of approximately $61,800.00 at the closing.

---

[13] D's Ex. E, Bates Stamp No. Eq. T 238. "HELOC" is the common abbreviation for "home equity line of credit."

[14] D's Ex. E, Bates Stamp No. Eq. T 242.

[15] D's Ex. E, Bates Stamp No. Eq. T 001-004.

*November 29, 2004 Windermere Property Closing*

The closing of the sale of the Windermere Property from Aman to Plaintiffs occurred as scheduled in the Sale Contract on November 29, 2004 at Equitable's office located at 7575 Dr. Phillips Boulevard, Suite 270, Orlando, Florida. Aman, Sonny, Plaintiffs, a representative of Bank of America, N.A. (the Plaintiffs' lender), and Equitable employees, including Gordon, were present at the closing. Aman executed various documents at the closing including:

  (i)    The HUD-1 Settlement Statement;

  (ii)   A Warranty Deed;

  (iii)  An Owner's Affidavit;

  (iv)   Compliance Agreement and Non-Coercion Statement.[16]

***HUD-1 Settlement Statement:*** Equitable prepared a final HUD-1 Settlement Statement that it presented to the parties at closing and the parties executed it. The executed HUD-1 Settlement Statement provides for the payoff of the BankUnited first-priority mortgage in the amount of $322,893.74 at line 504, but does not provide for the payoff of the First Horizon second-priority mortgage. The First Horizon mortgage does not appear on the HUD-1 Settlement Statement. The HUD-1 Settlement Statement, after deduction of the BankUnited mortgage payoff, home repairs, and customary closing costs, provided Aman was due to receive cash sale proceeds of $286,993.44.

The HUD-1 Settlement Statement should have provided for the payoff of the First Horizon second mortgage in the amount of approximately $225,127.00, but Equitable, despite knowing such mortgage lien existed and was of record as of November 19, 2004,

---

[16] Pls' Exs. 2,5,3, and 4, respectively.

failed to include the second mortgage on the HUD-1 Settlement Statement. The HUD-1 erroneously overstated Aman's cash proceeds by approximately $225,127.00 by failing to provide for the payoff of the First Horizon mortgage.

Aman certified in her execution of the HUD-1 Settlement Statement:

> I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.[17]

Gordon, as an agent of Equitable, executed the HUD-1 Settlement Statement on November 29, 2004 and certified:

> The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.[18]

Aman did not inform Plaintiffs of the First Horizon mortgage and Plaintiffs had no knowledge of the lien or any reason to believe the HUD-1 Settlement Statement was not accurate. Plaintiffs executed the HUD-1 Settlement Statement believing it to be accurate and providing for the satisfaction of all mortgage encumbrances.

*__Warranty Deed:__*    Equitable prepared a Warranty Deed conveying title to the Windermere Property from Aman as grantor to Plaintiffs as grantees. It was presented to the parties at closing and Aman executed it and warranted to Plaintiffs:

> [T]he grantor hereby covenants with said grantees that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land, and hereby warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, except taxes accruing subsequent to December 31, 2004.[19]

---

[17] Pls' Ex. 2, p. 2.

[18] Id.

[19] Pls' Ex. 5.

The First Horizon lien is not disclosed as an encumbrance on the Windermere Property in the Warranty Deed.

Gordon witnessed and notarized Aman's execution of the Warranty Deed. Gordon caused the Warranty Deed to be recorded in the Official Records Book of Orange County on December 10, 2004 at Book 07734, Page 1158.

*Owner's Affidavit:* Aman executed at the closing an Owner's Affidavit in which she warranted:

> There are no liens, encumbrances, mortgages, claims, boundary line or other disputes, demands or security interests in, on or against the Property or any good, furnishings, appliances, fixtures or equipment now installed in or which are to be affixed to the Property; except for the mortgages described in the deed given by the undersigned; that there are no unpaid taxes, levies, assessments, paving liens or utility liens against the Property (other than real estate taxes for the current year).
>
> . . .
>
> Under penalty of perjury, I/we declares that I/we have examined this certification and to the best of my knowledge and belief it is true, correct and complete . . . .
>
> Seller states that this instrument is given for the express purpose of inducing **Ray Nielson and Pandora Nielson, husband and wife** to purchase the Property and to cause **Equitable Title Agency, Inc.** as agent for **Lawyers Title Insurance Corporation** to insure title to said property. This Affidavit is made under the full understanding of the law regarding liability for any misrepresentation herein.[20]

Gordon notarized Aman's execution of the Owner's Affidavit.

*Compliance Agreement:* Aman and Plaintiffs executed a Compliance Agreement and Non-Coercion Statement pursuant to which they agreed to "fully cooperate and adjust for clerical errors on any or all closing documentation . . . ." and:

---

[20] Pls' Ex. 3, ¶¶A.3, B.7.

10

> to cooperate fully with Closing Agent in all efforts to assure that required sums for closing are collected from the appropriate parties. Further, the undersigned agree that should an[] oversight or error occur in the collection of said required sums they will immediately upon written or verbal notification make any required corrections or pay additional monies required.[21]

Gordon notarized the parties' execution of the Compliance Agreement and Non-Coercion Statement.

Equitable wore two hats at the closing. It conducted the closing of the entire real estate sale transaction and it issued title insurance policies. Equitable, in conducting the sale closing, was the agent of Aman and the agent of the Plaintiffs. In issuing the title insurance policies, Equitable was the agent of the insurance company Lawyers Title Insurance Corporation ("Lawyers Title").

Plaintiffs purchased an owner's title insurance policy through Equitable at the closing.[22] Equitable, as the agent of Lawyers Title, issued to Plaintiffs a Commitment for Title Insurance for the amount of $663,900.00 with an effective date of October 18, 2004.[23] Lawyers Title honored the title commitment and Equitable, as its agent, issued to Plaintiffs an Owner's Policy of Title Insurance, Policy Number A81-0181979, insuring Plaintiffs against title defects with a policy limit of $663,900.00.[24] The policy does not list the First Horizon mortgage as an exclusion from coverage.

Equitable, as the agent of Lawyers Title, issued two lenders policies to Bank of America as Plaintiffs' lender insuring it against title defects: (i) Policy Number G51-

---

[21] Pls' Ex. 4, p. 1.
[22] D's Ex. B, line 1108.
[23] D's Ex. E, Bates Stamp No. Eq. T 030-035.
[24] D's Ex. E, Bates Stamp No. Eq. T 070-075.

11

0222588 for the amount of $531,120.00; and (ii) G51-0222589 for the amount of $66,390.00.[25]

### *Sale Closing Proceeds*

Aman was expecting to receive and should have received a check at closing for sale proceeds of approximately $61,800.00. Equitable issued her a check for $286,993.44, Check No. 30627, which included funds of approximately $225,127.00 that should have been disbursed to First Horizon for the satisfaction of its second-priority mortgage. Aman accepted the check for $286,993.44. She did not advise anyone at the closing the First Horizon mortgage existed and was not addressed in the closing documents. The First Horizon mortgage was not satisfied at closing and continued to encumber the Windermere Property.

Plaintiffs left the closing believing the closing documents were accurate and complete and the Windermere Property was unencumbered, except for the Bank of America purchase money mortgages they had obtained to finance their purchase of the property. Bank of America issued loans of $531,120.00 and $66,390.00 to Plaintiffs pursuant to the Mortgages and Adjustable Rate Notes executed by Plaintiffs on November 29, 2004. Bank of America issued the loans on the basis the Bank of America Mortgages would have first and second positions on the Windermere Property and there were no other encumbrances on the property.

Plaintiffs took possession of the Windermere Property after the closing and have lived in the property since taking possession. They own the Windermere Property jointly in fee simple pursuant to the November 29, 2004 Warranty Deed.

---

[25] D's Ex. E, Bates Stamp No. Eq. T 070-088.

Aman negotiated the closing check for $286,993.44 ("Closing Funds") by depositing it into her personal checking account. At no time did she advise Equitable or Plaintiffs of the unsatisfied First Horizon mortgage or that the Closing Funds exceeded the amount to which she was entitled. She did not return any Closing Funds to Equitable and she did not pay off the First Horizon mortgage.

Aman, between the closing date and early January 2007, spent all of the Closing Funds plus the $225,127.00 she had received from the First Horizon home equity line of credit. Aman presented no personal financial records at trial, but testified during the period from the closing through January 2007 she:

(i)    Gave $100,000.00 to Sonny "for bills."

(ii)    Took Sonny and his children on three vacations totaling approximately $34,000.00.

(iii)    Purchased a Rolex watch for Sonny for approximately $8,000.00.

(iv)    Purchased timeshares in St. Thomas and West Palm Beach.

(v)    Purchased a car for Sonny's son for $12,000.00.

(vi)    Invested $175,000.00 in Sonny's Scottrade day-trading account, which was fully depleted through withdrawals for payment of various expenses and market losses.

(vii)    Paid $58,000.00 for the purchase of 11401 Jardim Orlando Court, Clermont, Florida ("Clermont Property") in December 2005.

(viii)    Made monthly mortgage payments of approximately $2,119.00 to Wachovia which holds first and second priority mortgages on the Clermont Property.

(ix)    Made monthly interest only mortgage payments to First Horizon on the unsatisfied home equity line of credit.

Aman has not been employed since 2003. Her sole experience with investing was taking a day-trading course in 2004. She testified her only sources of regular income since 2003 have been Social Security survivor benefits of approximately $3,000.00 per month, veteran's survivorship benefits of $1,400.00 per month, and pension benefits of $4,600.00 per month, totaling approximately $9,000.00 per month. Aman's Schedule I reflects her monthly survivorship and pension benefits total $3,008.00.

Aman's monthly expenditures after the Windermere Property closing were never less than $13,000.00 and sometimes were as high as $42,000.00 to $45,000.00. Aman admitted her monthly expenses exceeded her monthly income considerably.

### *Foreclosure Proceeding*

Aman continued to conceal the existence of First Horizon mortgage from Plaintiffs, and Plaintiffs remained unaware of the First Horizon mortgage encumbering their home. Aman was required to make monthly payments of approximately $2,400.00 to First Horizon and First Horizon issued monthly account statements to her, but the statements were not sent to the Windermere Property post-closing.

Aman listed the Windermere Property as her mailing address in the First Horizon loan documents and First Horizon's November 4, 2004 letter to Aman lists the Windermere Property as Aman's address. She was required, pursuant to the First Horizon loan documents, to inform First Horizon of her move from the Windermere Property. She did not advise First Horizon she was no longer residing at the Windermere Property.

Sometime after November 4, 2004 Aman directed First Horizon to send all statements and correspondence to a post office box opened in Sonny's name. Aman

received the monthly statements at the post office box. She made interest only monthly mortgage payments to First Horizon from 2004 through January 2007.

Aman expended all of her cash resources by early 2007 and she defaulted on the First Horizon loan in February 2007. CitiMortgage, Inc. ("CitiMortgage"), as the holder of the First Horizon loan, initiated foreclosure proceedings against Aman, Plaintiffs, and Bank of America in the Florida State Courts asserting a principal balance of $229,914.19 was due and owing, plus accrued interest, late charges, and collection costs pursuant to the First Horizon Note and Mortgage.[26]

Plaintiffs learned of the existence of the First Horizon mortgage when foreclosure papers were served on them. Plaintiffs engaged counsel to represent them in the foreclosure proceeding and they made a claim against their owner's title insurance policy. Lawyers Title became involved in the foreclosure proceeding and has provided counsel to Plaintiffs in that proceeding and in this adversary proceeding.

The only information presented by the parties relating to the foreclosure proceeding are CitiMortgage's Complaint to Foreclose Mortgage and its Notice of Voluntary Dismissal.[27] CitiMortgage, post-bankruptcy, voluntarily dismissed the foreclosure proceeding:

> Plaintiff, the Prevailing Party, by and through its undersigned counsel, voluntarily dismisses its Complaint for Foreclosure and Other Relief, *without Prejudice*, and cancel[s] the Notice of Lis Pendens as to the property . . . .[28]

The Notice indicates CitiMortgage filed a Notice of Lis Pendens against Plaintiffs' Property and the State Court, based upon the inclusion of the phrase "the Prevailing

---

[26] Pls' Ex. 6.
[27] D's Exs. F, G.
[28] D's Ex. G (*emphasis added*).

15

Party," issued a judgment in favor of CitiMortgage during the course of the foreclosure action.

### Aman's Bankruptcy Case

Aman filed a Chapter 7 bankruptcy case on July 22, 2008 ("Petition Date") and the State Court foreclosure proceeding was stayed by the automatic stay of 11 U.S.C. Section 362(a).  She lists total secured debts of $550,096.16, which encumber the Clermont Property and timeshare properties, and general unsecured debts of $458,792.24. She lists First Horizon as a general unsecured creditor in Schedule F for $257,561.63. The balance of her Schedule F debt consists primarily of credit card debts.  She lists assets of $521,304.82.

Aman resides at the Clermont Property with Sonny and his children.  The Clermont Property is encumbered by the mortgages held by Wachovia Mortgage, F.S.B. in the amounts of $462,356.16 and $87,740.00.  Aman values the Clermont Property at $512,315.00.  There is no equity in the Clermont Property or the timeshare properties. Wachovia was granted relief from the automatic stay to institute foreclosure proceedings against the Clermont Property.  The Chapter 7 Trustee declared this case a no asset case.

First Tennessee Bank, N.A., as the holder of the First Horizon unsatisfied mortgage, filed a proof of claim, Claim No. 1-1, in Aman's case asserting a claim of $259,361.63 as of the Petition Date with such claim secured by the Windermere Property.

### Aman's Testimony Regarding the Windermere Property Closing

Aman testified she did not read the closing documents or look at the disbursement check for $286,993.44 issued to her at closing.  She testified she failed to notice Equitable's omission of the First Horizon lien from the HUD-1 Settlement Statement

16

because she was upset over selling her home due to her emotional attachment to it and signed the closing documents robotically. She testified she did not look at the disbursement check until three days after the closing when she deposited it. Her testimony was not credible.

Aman is not unsophisticated in real estate matters and is experienced with real estate closing processes. She has a Bachelor of Science degree in business management and a minor in accounting. She was employed by a company as its business administrator and provided accounting services from 1997 to 1999. She was employed from 1999 through 2003 by GE Capital Mortgage Company where she assisted persons who were relocating by advancing them the equity in their homes.

Three weeks prior to the Windermere Property closing Aman participated in the closing of the First Horizon home equity loan where she reviewed a HUD-1 Settlement Statement and executed closing documents. She reviewed the draft HUD-1 Settlement Statement prepared by Equitable and identified two errors, which she communicated to Equitable. She informed Equitable of the First Horizon mortgage by telephone and facsimile.

Given Aman's experience with real estate matters, the care she took in reviewing Equitable's draft HUD-1 Settlement Statement, and the enormity, both emotionally and financially, of the Windermere Property sale, it is not plausible she did not review the closing documents and disbursement check. Aman knew she was obligated to convey good and marketable title to Plaintiffs. She knew the First Horizon lien needed to be satisfied in full at the closing in order to convey good and marketable title to the Plaintiffs.

17

Aman, at the closing, read and understood the closing documents. She read the finalized HUD-1 Settlement Statement and knew Equitable had corrected the prepayment penalty error but had failed to address the First Horizon lien. She looked at her disbursement check at the closing. She knew at the closing: (i) the First Horizon lien was not listed in the HUD-1 Settlement Statement and would not be satisfied; (ii) the disbursement check contained funds of approximately $225,127.00 to which she was not entitled; (iii) the First Horizon lien could have been satisfied in full at the closing had she informed the parties of Equitable's error; and (iv) she could not convey good and marketable title to the Windermere Property to Plaintiffs.

Aman, despite this knowledge, consummated the closing. She executed the closing documents and Warranty Deed knowing the First Horizon lien was unsatisfied and she was not conveying good and marketable title to the Windermere Property to Plaintiffs. She withheld material information regarding the First Horizon lien and falsely misrepresented the status of the title of the Windermere Property at the closing. The closing documents and Warranty deed contain material misrepresentations. Aman published the closing documents and Warranty Deed by delivering the executed documents to the parties at the closing knowing the documents misrepresented the status of the title.

Aman, post-closing, perpetuated and concealed her fraudulent omissions and acts by: failing to advise the parties of the First Horizon lien; failing to remedy the lien; expending the Closing Funds on luxury items; making loan payments to First Horizon; directing First Horizon to mail the monthly account statements to a post office box; and failing to notify First Horizon of the Windermere Property sale.

Aman's silence and misrepresentations were intentional and motivated by her desire to retain the Closing Funds. The totality of the circumstances establishes Aman acted with the intent to deceive Plaintiffs. Plaintiffs justifiably and reasonably relied upon Aman's misrepresentations made in the closing documents and Warranty Deed. Plaintiffs believed they were obtaining good and marketable title to the Windermere Property. Aman did not convey good and marketable title to them.

Plaintiffs have suffered damages as a result of their reliance on Aman's fraudulent omissions and misrepresentations, which include: (i) their home is encumbered by the unsatisfied First Horizon lien which has reduced the equity in their home by at least $259,361.63; (ii) the lien prevents Plaintiffs from refinancing, selling, or conveying their home; (iii) Plaintiffs are defendants in the State Court foreclosure litigation; (iv) Plaintiffs have suffered emotional distress as a result of this situation.

Plaintiffs have established by a preponderance of the evidence they are entitled to judgment against Aman pursuant to 11 U.S.C. Sections 523(a)(2)(A) and 523(a)(2)(B).

## CONCLUSIONS OF LAW

### *11 U.S.C. Section 523(a)(2)(A)*

Plaintiffs timely instituted their nondischargeability action against Aman asserting the unsatisfied First Horizon mortgage debt of approximately $259,361.63 is nondischargeable pursuant to 11 U.S.C. Section 523(a)(2)(A). They assert Aman, by failing to disclose the First Horizon mortgage and executing the closing documents and Warranty Deed, knowingly made false statements with the intent to deceive Plaintiffs. Plaintiffs assert they relied upon these false statements to their detriment and have incurred damages.

19

Aman disputes she made any false statements or committed any fraudulent acts. She asserts the sale closing was emotionally challenging and she signed the closing documents without reading them. She contends she did not look at the check Equitable issued to her at the closing and only reviewed the check three days later when she deposited it.

Section 523(a)(2)(A) provides a discharge pursuant to Section 727 does not discharge an individual from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—"

> false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.[29]

Plaintiffs have the burden to establish the unsatisfied First Horizon mortgage indebtedness is nondischargeable by a preponderance of the evidence.[30] The burden is considerable because exceptions to discharge are to "be strictly construed against the creditor and liberally in favor of the debtor."[31]

Plaintiffs must establish the traditional elements of common law fraud to prevail: (i) Aman made a false representation to deceive Plaintiffs; (ii) Plaintiffs relied on the misrepresentation; (iii) the reliance was justified; and (iv) Plaintiffs sustained a loss as a result of the misrepresentation.[32] Plaintiffs must establish each of these elements by a preponderance of the evidence.[33]

---

[29] 11 U.S.C. § 523(a)(2)(A).
[30] Grogan v. Garner, 498 U.S. 279, 291 (1991).
[31] Schweig v. Hunter (In re Hunter), 780 F.2d 1577, 1579 (11th Cir. 1986).
[32] SEC v. Bilzerian (In re Bilzerian), 153 F.3d 1278, 1281 (11th Cir. 1998); Fuller v. Johannessen (In re Johannessen), 76 F.3d 347, 350 (11th Cir. 1996).
[33] Grogan, 498 U.S. at 291; In re Wiggins, 250 B.R. 131, 134 (Bankr. M.D. Fla. 2000).

The cornerstone element in a Section 523(a)(2)(A) nondischargeability proceeding is a misrepresentation made with the intent to deceive the creditor. A creditor cannot establish non-dischargeability pursuant to Section 523(a)(2)(A) without proof of reliance on intentional misstatements by the debtor.[34] A false statement made in reckless disregard of the truth constitutes a false representation pursuant to Section 523(a)(2)(A).[35] A debtor's silence constitutes a false representation where the debtor had a duty to disclose material facts and she, motivated by an intent to deceive, failed to disclose those facts.[36] A determination of fraudulent intent is an issue of fact and "depends largely upon an assessment of the credibility and demeanor of the debtor . . . ."[37] A review of the totality of the circumstances is relevant in determining a debtor's intent.[38]

The reliance upon the false representation must be justified.[39] Whether reliance is justified is determined by a subjective test.[40] A plaintiff, as the final nondischargeability element, must establish a causal link between the debtor's intentional misrepresentation and the resulting loss sustained by the plaintiff.[41]

### 11 U.S.C. Section 523(a)(2)(B)

Section 523(a)(2)(B) excepts a debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by:

(B) use of a statement in writing—

(i)      that is materially false;

---

[34] City Bank & Trust Co. v. Vann (In re Vann), 67 F.3d 277, 280 (11th Cir. 1995).
[35] Birmingham Trust Nat. Bank v. Case, 755 F.2d 1474, 1476 (11th Cir. 1985).
[36] In re Eashai, 87 F.3d 1082, 1089 (9th Cir. 1996).
[37] Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 305 (11th Cir. 1994).
[38] Id.
[39] Field v. Mans, 516 U.S. 59, 73-75 (1995); In re Vann, 67 F.3d at 283-84.
[40] In re Vann, 67 F.3d at 281.
[41] Lightner v. Lohn, 274 B.R. 545, 550 (M.D. Fla. 2002).

(ii)    respecting the debtor's or an insider's financial condition;

(iii)   on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv)    that the debtor caused to be made or published with intent to deceive.[42]

The "intent to deceive" analysis employs the same intent analysis employed in a Section 523(a)(2)(A) determination and may be established by the totality of the circumstances.[43] A failure to read closing documents constitutes reckless indifference and disregard of readily available information and is sufficient to establish an intent to deceive.[44]

A plaintiff must also establish causation—that it sustained a loss as a result of the representation, which is an implied element of Section 523(a)(2)(B).[45]  The debt is dischargeable if any one of the elements is not established.[46]

A debtor's assertion he owns property free and clear of liens is a statement respecting his financial condition, and such assertion, if false, may form the basis of a Section 523(a)(2)(B) nondischargeability cause of action.[47]  "Indeed, whether his assets are unencumbered may be the most significant information about his financial condition."[48]

### *Dischargeability Analysis*

Aman covenanted to convey "marketable title" to the Windermere Property to Plaintiffs pursuant to Paragraph 10 of the Sale Contract.  Aman executed the closing

---

[42] 11 U.S.C. § 523(a)(2)(B).
[43] In re DeJulio, 322 B.R. 456, 461 (Bankr. M.D. Fla. 2005).
[44] Id.
[45] Collins v. Palm Beach Sav. & Loan (In re Collins), 946 F.2d 815, 816 (11th Cir. 1991).
[46] In re Miller, 39 F.3d at 304.
[47] Engler v. Van Steinburg (In re Van Steinburg), 744 F.2d 1060, 1061 (4th Cir. 1984).
[48] Id.

documents and Warranty Deed warranting the Windermere Property was "free of all encumbrances, except taxes accruing subsequent to December 31, 2004."[49]

Plaintiffs executed the Sale Contract relying upon Aman's covenant and expected to obtain marketable title to the property.  They accepted the Warranty Deed believing Aman was conveying to them marketable title to the Windermere Property.  Plaintiffs would not have consummated the closing had they known Aman was not conveying marketable title.

Aman was contractually obligated to convey to Plaintiffs good and marketable title to the Windermere Property pursuant to the Sale Contract and the Warranty Deed. "Marketable title" means:

> [N]ot merely a title valid in fact but a title that must be such as to make it reasonably certain that it will not be called in question in the future so as to subject the purchaser to the hazard of litigation with reference thereto and must be free from reasonable doubt as to any question of fact or law necessary to sustain its validity. It must be, as is sometimes said, a title which can be sold to a reasonable purchaser or mortgaged to a person of reasonable prudence, and which is not subject to such a doubt or cloud as will affect its market value.[50]

Plaintiffs' home is encumbered by the unsatisfied First Horizon mortgage.  The First Horizon mortgage is not disclosed in or listed as an exception in the Sale Contract, closing documents or Warranty Deed.  Plaintiffs did not assume or agree to the encumbrance and had no knowledge of the encumbrance until three years after the closing when they were served with CitiMortgage's foreclosure papers.

"[U]ndisclosed liens, encumbrances, exceptions or qualifications constitute defects in the title to real property which render title unmarketable within the meaning of

---

[49] Pls' Ex. 5.
[50] <u>Adams. Whittle</u>, 135 So. 152, 155 (Fla. 1931).

the standard real estate contract . . . ."[51]  The title to the Windermere Property is unmarketable.[52] Aman did not convey good and marketable title to Plaintiffs.

Aman knew all mortgages encumbering the Windermere Property needed to be satisfied at the sale closing in order to convey marketable title to Plaintiffs.  She knew the First Horizon home equity loan was secured by a second-priority mortgage on the Property.  She knew the First Horizon home equity loan needed to be on the HUD-1 Settlement Statement and paid in full at closing.

Equitable erroneously failed to include the First Horizon mortgage in the HUD-1 Settlement Statement and did not satisfy the mortgage.  Aman executed the HUD-1 Settlement Statement certifying it was true and correct.  She executed the Warranty Deed, Owner's Affidavit, and Compliance Agreement certifying she had disclosed all encumbrances on the Windermere Property and warranted the title was free of all encumbrances, other than accrued real property taxes.  She published the closing documents and Warranty Deed by presenting them to the parties present at the closing and through the recordation of the Warranty Deed.

Aman's certifications and warranties were not true and correct.  She falsely represented in the closing documents and Warranty Deed the Windermere Property was free of encumbrances.  Aman knew the First Horizon mortgage encumbered the Windermere Property and she knew the encumbrance needed to be satisfied at the closing in order to convey good and marketable title to Plaintiffs.

---

[51] Bailey v. First Mortg. Corp. of Boca Raton, 478 So.2d 502, 504 (Fla. 1st DCA 1985).
[52] Id.

24

Aman had a duty to disclose the First Horizon encumbrance to Plaintiffs and to advise Equitable of its erroneous omission from the HUD-1 Settlement Statement.[53] Instead of speaking up at the closing, Aman withheld this material information, consummated the closing, and accepted the Closing Funds. The encumbrance could have been satisfied in full had Aman advised the parties at the closing of the First Horizon encumbrance.

Aman withheld material information regarding the First Horizon lien and misrepresented the status of the title of the Windermere Property at the closing. Her omissions and misrepresentations were intentional and motivated by her desire to retain the Closing Funds overage of approximately $225,127.00.    The totality of the circumstances establishes Aman acted with the intent to deceive Plaintiffs:

(i) Aman's testimony that she did not read the closing documents or look at the closing check was not credible. She is sophisticated in real estate transactions and the closing was one of the most, if not the most, important transactions of her life, both financially and emotionally.  She, at the closing, read and understood the closing documents, Warranty Deed, and disbursement check.

(ii) She informed Equitable of the First Horizon lien in telephone conversations and reviewed the draft HUD-1 Settlement Statement. She identified two errors in the draft HUD-1 and informed Equitable of the errors by letter. Aman certainly reviewed the finalized HUD-1 Settlement Statement at the closing and observed Equitable had corrected the prepayment penalty error.

---

[53] In re Reitz, 134 B.R. 131, 133 (Bankr. D. Del. 1991).

(iii)  Aman accepted and negotiated the disbursement check knowing she had been overpaid by approximately $225,127.00.  Aman had an on-going duty to report and remedy any errors discovered post-closing pursuant to the Compliance Agreement. Aman did not bring the error to Equitable's or Plaintiffs' attention.

She had no intention of reporting or remedying the error.  She made no attempt to repay the Closing Funds and expended all of the Closing Funds on luxury purchases, gifts, and living expenses.

(iv) She actively concealed the fraudulent omissions and misrepresentations she made in the closing documents and Warranty Deed by:  (a) continuing to pay the First Horizon mortgage; (b) directing First Horizon to send the monthly statements to a post office box; and (c) failing to notify First Horizon of the sale of the Windermere Property.

Plaintiffs justifiably and reasonably relied on Aman's representations she was conveying marketable title to the Windermere Property to them.  They had no knowledge of the First Horizon encumbrance and believed all of Aman's representations and warranties in the closing documents were true and accurate.  They paid the purchase price and fulfilled all of their closing obligations.  They would not have proceeded with the closing had they known the First Horizon loan encumbered the Windermere Property.  As the Supreme Court held in Field v. Mans, a buyer's reliance on a seller's representation the land is free of encumbrances "is justifiable, even if he could have 'walk[ed] across the street to the office of the register of deeds in the courthouse' and easily have learned of an unsatisfied mortgage."[54]

---

[54] Field v. Mans, 516 U.S. 59, 70 (1995) (citation omitted).

Plaintiffs have suffered damages as a result of their reliance on Aman's misrepresentations. Their home is encumbered by the unsatisfied mortgage in the amount of approximately $259,361.63. Such encumbrance has reduced the equity in their home by at least $259,361.63. The encumbrance prevents Plaintiffs from refinancing, selling, or conveying their home. Foreclosure litigation has been instituted against Plaintiffs in the Florida State Court, with a possible judgment having been entered against them in favor of CitiMortgage. The foreclosure action has certainly affected their credit standing. They have suffered emotional distress as a result of this situation.

Plaintiffs have established by a preponderance of the evidence each of the nondischargeability elements of Sections 523(a)(2)(A) and 523(a)(2)(B). The indebtedness of approximately $259,361.63 of the unsatisfied First Horizon mortgage is nondischargeable pursuant to Sections 523(a)(2)(A) and 523(a)(2)(B).

### Debtor's Third Party Complaint

Aman filed a one-count Third Party Complaint against Equitable asserting Equitable was negligent and breached its duty in failing to satisfy the First Horizon mortgage at closing. Aman asserts she is entitled to contribution from Equitable for any liability she may have to Plaintiffs relating to Plaintiffs' Amended Complaint.

Aman served the Third Party Complaint and Summons on Equitable's Vice President on February 25, 2009.[55] Equitable did not file a response. Aman served a Subpoena Duces Tecum for Production of Documents[56] on Equitable pursuant to which Equitable produced a copy of the file for the Windermere Property closing.[57] Aman

---

[55] Doc. No. 20.
[56] Doc. Nos. 30, 43.
[57] D's Ex. E.

27

served a Subpoena to Appear and Testify on Trial on F. Larry Joseph of Equitable directing him to appear at the trial.[58] No representative of Equitable appeared at the trial and the parties did not request the entry of an order releasing Mr. Joseph from the Subpoena.

Aman's negligence claim is governed by Florida State statutory and case law based upon Equitable's status as a Florida title insurance agent. A plaintiff must establish four essential elements to sustain a cause of action for negligence in Florida: (i) the defendant owed a duty of care to the plaintiff; (ii) the defendant breached the duty; (iii) the breach caused injury to the plaintiff; and (iii) that damages are owed. The first step in conducting a negligence analysis is to identify the applicable standard of care with respect to a duty and then determine to whom such duty is owed.[59]

Equitable, as the agent of the title insurer Lawyers Title, had a contractual and statutory duty to make a thorough and competent search of the record title.[60] Equitable breached that duty by failing to discover and disclose the First Horizon mortgage encumbrance. The Florida Courts have held that failure to discover and disclose an encumbrance of record does not constitute an independent cause of action for negligence against the title agent, but constitutes a breach of the title policy.[61] Aman's negligence cause of action is not actionable pursuant to Florida's contractual privity economic loss

---

[58] Doc. Nos. 41, 42.
[59] Bryant v. Lucky Stores, Inc., 577 So.2d 1347, 1352 n.2 (Fla. 2d DCA 1990).
[60] Chicago Title Ins. Co. v. Commonwealth Forest Invests., Inc., 494 F. Supp.2d 1332, 1336 (M.D. Fla. 2007); Fla. Stat. §§ 627.784, 627.7845(1).
[61] Chicago Title Ins. v. Commonwealth Forest, 494 F. Supp.2d at 1336.

rule.[62] "Where damages sought in tort are the same as those for breach of contract a plaintiff may not circumvent the contractual relationship by bringing an action in tort."[63]

Aman cannot establish damages even if her negligence cause of action were actionable. Aman was not damaged, but benefitted from Equitable's error, and she affirmatively attempted to conceal the error. Aman's Third Party Complaint is due to be dismissed. Id. at 1338.

### Defendant CitiMortgage

Plaintiffs named CitiMortgage as a defendant in their original Complaint and Amended Complaint. CitiMortgage has a security interest in the Property by virtue of the unsatisfied First Horizon mortgage and it seeks to subrogate such interest. No summons was issued on CitiMortgage and Plaintiffs did not serve CitiMortgage with process. CitiMortgage has not appeared in this proceeding and Plaintiffs have not pursued their claims against CitiMortgage. CitiMortgage is due to be dismissed as a defendant.

### 11 U.S.C. Section 523(d)

Aman requests an award of attorney's fees and costs pursuant to 11 U.S.C. Section 523(d) in her Answer (Doc. No. 36). Aman is not the prevailing party in this matter and her request is due to be denied.

### Conclusion

This proceeding, at its core, is a basic title insurance claim by Plaintiffs against their title insurer Lawyers Title. The First Horizon lien was an encumbrance of record against the Windermere Property as of November 16, 2004. Equitable, Lawyers Title's agent, erroneously failed to satisfy the First Horizon lien at the closing. Plaintiffs

---

[62] Id.; Indemnity Ins. Co. of N. Am. v. American Aviation, Inc., 891 So.2d 532, 536 (Fla. 2004).
[63] Ginsberg v. Lennar Fla. Holdings, Inc., 645 So. 2d 490, 494 (Fla. 3d DCA 1994).

purchased an owner's title insurance policy to protect them against this very type of error. Plaintiffs were entitled to rely on their owner's policy guaranty there were no recorded mortgage liens on the Windermere Property and Lawyers Title bears the risk of loss for the unsatisfied First Horizon lien.[64] Lawyers Title has not paid the claim, but, instead, as Plaintiffs' counsel, has expended resources and time litigating this nondischargeability action against Aman.

Plaintiffs' pursuit of a nondischargeable judgment against Aman is inexplicable. It is unlikely Plaintiffs, or an assignee of their judgment, will obtain any recovery from Aman based upon her financial condition. The Trustee has designated Aman's case a no asset case, there is no equity in Aman's non-exempt assets, namely the Clermont Property, and she is unemployed with no meaningful employment prospects in sight.

The outcome of this adversary proceeding will not impact or affect Plaintiffs' title insurance claim. Title insurance was developed precisely to protect purchasers of real property from the type of error Equitable committed.[65] "The man on the street buys a title insurance policy to insure against defects in the record title. The title insurance company is in the business of guaranteeing the insured's title to the extent it is affected by the public records."[66]

The general rule is that title insurance coverage extends to existing unsatisfied mortgages, unless one of the narrow case law-created exceptions applies:

---

[64] Morton v. Attorneys' Title Ins. Fund, Inc., __ So.3d __, No. 2D08-1313, 2009 WL 1975901, at *3 (Fla. 2d DCA July 10, 2009).
[65] Lawyers Title Ins. Corp. v. D.S.C. of Newark Enters., Inc., 544 So.2d 1070, 1072 (Fla. 4th DCA 1989).
[66] McDaniel v. Lawyers' Title Guaranty Fund, 327 So.2d 852, 855 (Fla. 2d DCA 1976).

> [I]t follows that the title insurance company does not and should not avoid liability when a defective condition of title not excepted from coverage subsequently causes a loss to the insured even though the insured knew or should have known of the particular defect. That is the general principle on which we resolve this case, although we are aware that its appropriate application is not without exception.[67]

The exceptions include: (i) the condition was physically observable by an inspection of the premises; (ii) the insured expressly assumed the condition; (iii) the condition resulted from the *fraud of the insured*; or (iv) the insured had actual, express knowledge of the condition.[68]

None of the exceptions apply. Aman's failure to speak up and notify the parties at closing of the error does not absolve Lawyers Title of its contractual obligations owed to Plaintiffs pursuant to their owner's title insurance policy. Lawyers Title admits in its closing brief the outcome of this adversary proceeding will have no bearing on Plaintiffs' title insurance claim: "The title insurance company has confirmed that a ruling against Aman will in no way be used to later deny coverage for the Nielsons."[69]

Plaintiffs have established by a preponderance of the evidence each of the nondischargeability elements of 11 U.S.C. Sections 523(a)(2)(A) and 523(a)(2)(B), whatever the underlying motivation was in instituting this nondischargeability action. The First Horizon lien indebtedness is nondischargeable.

Accordingly, it is

**ORDERED, ADJUDGED and DECREED** that CitiMortgage is hereby **DISMISSED** as a party defendant in this proceeding; and it is further

---

[67] Lawyers Title Ins. Corp. v. D.S.C., at 1072.
[68] Id. at 1072-73.
[69] Main Case Doc. No. 41, p. 12.

**ORDERED, ADJUDGED and DECREED** that Aman's Motion for Summary Judgment against Equitable (Doc. No. 26) is hereby **DENIED** and her Third Party Complaint against Equitable (Doc. No. 14) is hereby **DISMISSED**; and it is further

**ORDERED, ADJUDGED and DECREED** that Plaintiffs' *ore tenus* motion to amend their Amended Complaint to conform to the evidence is hereby **GRANTED** and Plaintiffs' Amended Complaint (Doc. No. 3) includes 11 U.S.C. Section 523(a)(2)(A) and 11 U.S.C. Section 523(a)(2)(B) nondischargeability causes of action; and it is further

**ORDERED, ADJUDGED and DECREED** that Aman's *ore tenus* motion to dismiss the Complaint is hereby **DENIED**; and it is further

**ORDERED, ADJUDGED and DECREED** that Aman's Motion for an award of attorney's fees is hereby **DENIED**.

A separate Judgment consistent with these Findings of Fact and Conclusions of Law shall be entered contemporaneously.

Dated this 26th day of March, 2010.

ARTHUR B. BRISKMAN
United States Bankruptcy Judge